## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Matthew Bowen, | Case No. 19-cv-2683 (SRN/LIB) |
| Plaintiff, | |
| v. | **ORDER** |
| U.S. Bank National Association, | |
| Defendant. | |

David H. Redden and Nicholas G.B May, Fabian May & Anderson, PLLP, 825 Nicollet Mall, Ste. 1625, Minneapolis, MN 55402, for Plaintiff.

Janet M. Olawsky, Jessica M. Marsh, Lee A. Lastovich, 150 South Fifth Street, Ste. 3500, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

Before the Court is Defendant U.S. Bank National Association's ("U.S. Bank") Motion to Dismiss for Failure to State a Claim (("Motion to Dismiss") [Doc. No. 5]). Plaintiff Matthew Bowen opposes this motion, arguing that he has properly stated a claim against U.S. Bank for retaliatory discharge in violation of the Minnesota Whistleblower Act ("MWA"), Minn. Stat. § 181.932, subd. 1.  By contrast, U.S. Bank contends that Mr. Bowen's claim is preempted by the National Bank Act ("NBA"), 12 U.S.C § 21, a statute that gives banks wide latitude in hiring and firing bank officers.  *See* 12 U.S.C § 24 (Fifth).

Having carefully reviewed the record, the Court denies Defendant's motion for the reasons set forth below.

## II.   FACTUAL BACKGROUND

The facts pertinent to this matter are set forth in this Court's Order dated April 15, 2020 ("Supplemental Briefing Order" [Doc. No. 20] at 1-4) and are incorporated by reference here.  Stated briefly, U.S. Bank is a national bank headquartered in Minnesota, with its main office located in Cincinnati, Ohio.[1]  (("Compl.") [Doc. No. 1], ¶ 4.)  Mr. Bowen worked for U.S. Bank first as a Risk Manager and then later as Vice President and Corporate Counsel.  (*Id*. ¶¶ 5-7.)

In or around December 2016, U.S. Bank hired Jorge Rivera as its Associate General Counsel and leader of U.S. Bank's Legal Regulatory Group consumer banking regulatory attorneys.  (*Id*. ¶¶ 8-9.)  Hierarchically, Mr. Rivera was two supervisory positions above Mr. Bowen.  (*Id*. ¶ 9.)

Before Mr. Rivera was hired, however, it is alleged that the Office of Comptroller of the Currency ("OCC") and Federal Reserve Board of Governors ("FRB") each issued consent orders (the "Consent Orders"), charging that U.S. Bank had "failed to devote to its foreclosure process adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services."  (*Id*. ¶ 11.)  The Consent Orders "required U.S. Bank to remedy these issues."  (*Id*.)

---

[1]     In setting forth the facts of this case for this present motion, the Court "assumes as true all factual allegations in the pleadings, interpreting them most favorable to [Plaintiff], the nonmoving party."  *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1128 (8th Cir. 2019).

In response, U.S. Bank compiled a set of materials that identified the foreclosure requirements for each of the 50 states and the District of Columbia ("the Foreclosure Reference Materials"). (*Id*. ¶ 12.) According to the Complaint, U.S. Bank personnel used these materials as their sole basis for certifying the bank's compliance with foreclosure laws to the Federal Housing Administration ("FHA") for purposes of securing federal insurance benefits. (*Id*. ¶¶ 17, 20, 39.) To allegedly ensure continued compliance with the "frequently-changing requirements in the various jurisdictions," U.S. Bank had outside counsel coordinate a quarterly review of the materials. (*Id*. ¶ 18.) This quarterly review ensured, among other things, that U.S. Bank was "observing current foreclosure law[s]" and ultimately played a "key role" in "convincing the OCC and FRB regulators to release U.S. Bank from the Consent Orders." (*Id*. ¶ 19) (stating that the "importance of these quarterly updates cannot be overstated."). As Vice President & Corporate Counsel, it is alleged that Mr. Bowen was responsible for shepherding the quarterly review by forwarding the Foreclosure Reference Materials to the law firm of Dorsey & Whitney. (*Id*. ¶ 18.)

After Mr. Rivera started working for U.S. Bank, in December 2016, it is alleged that Assistant General Counsel Alona Rindal and Senior Corporate Counsel Beth Northrop-Day advised Mr. Bowen and his manager, Wade Pyun, that "senior management" of the Mortgage Servicing business line had instructed that all legal work performed for the business was to be consolidated and transferred to the Alabama-based law firm Bradley Arant ("Bradley"). (*Id*. ¶ 21.) It is alleged that this direction deviated from U.S. Bank's "typical practice," which allowed the bank's Law Division to select outside law firms, even

3

if the business line was covering the expense. (*Id.*) Subsequently, it is alleged that Messrs. Bowen and Pyun were instructed that they were to "immediately pull the quarterly update project from Dorsey & Whitney" and assign it to the Bradley firm, for a cost "dramatically more" than Dorsey & Whitney charged for the same work. (*Id.* ¶ 22.) For instance, while Dorsey & Whitney charged $10,000 per quarter ($40,000 annually), Bradley would charge $90,000 per quarter ($360,000 annually). (*Id.*) Although the fees were allegedly negotiated down eventually, it remained "significantly more" than the fees Dorsey & Whitney charged for the same work. (*Id.* ¶ 24.)

Mr. Bowen started becoming "suspicious of the motives for consolidating the work" to the Bradley firm, because in addition to agreeing to pay "significantly more" in fees for the quarterly reports, Mr. Bowen also allegedly observed Ms. Rindal and her direct reports assigning "unnecessary work" to the firm that was "already being reviewed in-house, again citing the business line management as requesting outside review." (*Id.* ¶ 25.) After the Bradley firm failed to meet its deadline for completing the quarterly review project in April 2017, Mr. Bowen allegedly relayed his suspicions on a conference call that included Mr. Rivera, Mr. Pyun, Ms. Rindal and Ms. Northrop-Day. (*Id.* ¶¶ 27-32.) "Immediately" following the conference call, it is alleged that Mr. Rivera berated Mr. Bowen "for reporting his concerns about the potentially unlawful conduct" concerning the appearance of an improper relationship between Ms. Rindal, Ms. Northrop-Day, and the Bradley firm. (*Id.* ¶ 33.)

Approximately one month after the conference call, in May 2017, a partner in Bradley's real estate and finance practice named "Chet Little" was allegedly indicted by

the FBI.  (*Id.* ¶ 34.)  The last name stood out to Mr. Bowen because it "happened to be the last name of the Executive Vice President of U.S. Bank's Mortgage Servicing business line—the business line whose senior management had allegedly demanded that all the legal work be consolidated at the Bradley firm."  (*Id.*)  Given the totality of the circumstances, Mr. Bowen believed the situation "could only be explained by a fraudulent relationship between a bank employee and an attorney with Bradley."  (*Id.* ¶ 35.)  Thus, it is alleged that Mr. Bowen reported the situation to Kyle Bakken, the U.S. Bank attorney "responsible for investigating internal fraud."  (*Id.* ¶ 36.)

After this meeting, Mr. Bowen allegedly informed Mr. Rivera, in passing, that he had reported the Bradley matter to Mr. Bakken.  (*Id.* ¶ 37.)  Upon hearing this news, Mr. Rivera apparently seemed "shocked" and "unhappy."  (*Id.*)  Nonetheless, later that same day, Mr. Bowen continued to try and explain to Mr. Rivera the significance of the Foreclosure Reference Materials and the Bradley firm's failure to timely update them.  (*Id.* ¶¶ 39-40.)  Although Mr. Rivera purportedly acknowledged that the situation "appear[ed] to suggest an improper relationship" between Ms. Rindal, Ms. Northrop-Day and the Bradley law firm, he asserted that it was "not worth causing controversy over" because Mr. Rivera was "up for a promotion."  (*Id.* ¶ 41.)  Additionally, Mr. Rivera allegedly threatened Mr. Bowen's job if he escalated this matter to the Deputy General Counsel and General Counsel, claiming his future at U.S. Bank was in "great jeopardy."  (*Id.*)  Three days later, Mr. Rivera allegedly continued his beratement, claiming he could not trust Mr. Bowen's judgment and that he needed to work on his "emotional intelligence."  (*Id.* ¶ 42.)  Concerned about these comments, Mr. Bowen allegedly told Mr. Bakken that he "felt he

was being retaliated against, and that he feared he would lose his job." (*Id.* ¶ 43.) Mr. Bakken, however, allegedly assured him that if he were terminated, Mr. Bakken would "report to Human Resources that Mr. Bowen was a whistleblower and would explain the situation and everything he had relayed." (*Id.*)

A little more than a week later, on June 27, 2017, Mr. Bowen was terminated. (*Id.* ¶¶ 44-45.) Although the asserted reason for his termination was that he concealed that he had failed the Minnesota bar exam, Mr. Bowen claims that this explanation is a "mere pretext." (*Id.* ¶ 46.) He alleges that he was terminated by Mr. Rivera "for exposing suspected fraud and embezzlement involving certain employees of U.S. Bank and a law firm championed by those employees [*i.e.*, Bradley], and for reporting U.S. Bank's likely violation of the False Claims Act by acting with reckless disregard as to its certifications of compliance with state home mortgage laws." (Pl.'s Mem. of Law in Opp. to Mot. to Dismiss Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) ("Pl.'s Opp'n") [Doc. No. 13] at 2; *see generally* Compl.) In fact, he claims that taking the Minnesota bar exam was never a "condition of employment" and he had notified Mr. Pyun "the day he received his results," but was allegedly told "not to worry about it," and to "take [the exam] again" when he had sufficient time to prepare. (Compl. ¶ 46.)

## III.   DISCUSSION

U.S. Bank contends that Mr. Bowen's MWA claim is preempted by Section 24 of the National Bank Act. 12 U.S.C. § 24. The NBA empowers the bank, in relevant part:

> [T]o appoint a president, *vice president*, cashier, and other officers, *define their duties*, . . . , *dismiss such officers or any*

*of them at pleasure*, and appoint others to fill their places.

12 U.S.C § 24 (Fifth) (emphasis added).  Here, it is undisputed that U.S. Bank is an association covered by the NBA.  (*See* Bidon Decl. ¶ 3, Ex. A.)  And the Court has previously ruled that, based on the pleadings and materials embraced by the pleadings: (1) Mr. Bowen held the title of "Vice President" in 2017, which is an "officer" pursuant to the bank's amended and restated bylaws, (*see* Compl. ¶ 6; Bidon Decl. ¶ 4, Exhibit B at Art. III, Sec. 1.), and (2) Mr. Bowen's termination was ratified by the bank's board of directors, which meets the dismissal requirement under § 24 (Fifth), (Bidon Decl., Exs. C, E (Board Resolutions)).  (*See* Supplemental Briefing Order at 5-11.)

Thus, the question for the Court's determination now is whether the NBA, in light of its "dismiss at-pleasure" clause, in fact preempts Mr. Bowen's MWA claim.  The federal preemption doctrine arises from the Supremacy Clause of the Constitution, which requires that a state law "must give way when it conflicts with or frustrates federal law." *Chapman v. Lab One*, 390 F.3d 620, 624 (8th Cir. 2004) (citing U.S. Const. Art. VI, cl. 2) (further citation omitted)).  The law delineates three types of preemption.  *N. Natural Gas Co. v. Iowa Utils. Bd.*, 377 F.3d 817, 821 (8th Cir. 2004).  Federal law may preempt state law under (1) express preemption, where Congress expressly prohibits state regulation; (2) field preemption, where Congress implicitly leaves no room for state involvement by pervasively occupying a field of regulation; or (3) conflict preemption, where state law directly conflicts with federal law.  *Chapman*, 390 F.3d at 624 (citations omitted)).

### A.      Federal Conflict Preemption

Here, U.S. Bank does not argue that the National Bank Act contains an express preemption provision, nor that field preemption here exists.  (Def.'s Mem. of Law in Supp. of Mot. to Dismiss Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) ("Def.'s Mem") [Doc. No. 7] at 6.)  Rather, Defendant argues that "conflict preemption" bars Mr. Bowen's MWA claim.  (*Id*. at 9-11.)

Under conflict preemption, a conflict exists when federal and state statutes are in irreconcilable conflict or when state law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."  *Dakota v. Swanson*, No. 11-cv-3232 (SRN/SER), 2012 WL 4479246, at *4 (D. Minn. Sep. 30, 2012) (quoting *N. Natural Gas Co*., 377 F.3d at 821)).  However, the Supreme Court has recently cautioned that this doctrine must be construed narrowly, without "invoking some brooding federal interest or appealing to a judicial policy preference[.]"  *Virginia Uranium, Inc. v. Warren*, 139 S.Ct. 1894, 1901 (2019) (citations omitted)).  Rather, "a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Id*.  Moreover, any evidence of Congress' preemptive "purpose" must be sought in a statute's text and structure.  *Id*. at 1907 (rejecting the proposition that a state statute may be preempted based on "abstract and unenacted legislative desires" not reflected in a statute's text).

It is U.S. Bank's burden of proof to establish conflict preemption.  *See Chamber of Commerce of U.S. v. Whiting,* 563 U.S. 582, 607 (2011) (noting that "[o]ur precedents establish that a high threshold must be met if a state law is to be preempted for conflicting

with the purposes of a federal [a]ct.") (citation omitted) (internal quotation marks omitted)).  U.S. Bank must therefore establish that the MWA "stands as an obstacle" to Congress' identified objectives for enacting the NBA.  *Paris Limousine of Oklahoma, LLC v. Executive Coach Builders, Inc*., 867 F.3d 871, 874 (8th Cir. 2017) (quoting *Geier v. Am. Honda Motor Co*., 529 U.S. 861, 873-74 (2000); citing *Williams v. Nat'l Football League*, 582, F.3d 863, 880 (8th Cir. 2009) (burden is on party asserting federal preemption) (further citation omitted)).

Against these standards, the Court finds that U.S. Bank has failed to meet its burden to demonstrate that the NBA preempts the MWA for two reasons.  First, to assess the purpose and "objective" of the NBA's "dismiss at-pleasure" provision, the Supreme Court has instructed courts to rely upon its statutory text, structure, and legislative history.  *See, e.g.*, *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (explaining that where "explicit pre-emption language does not appear, or does not directly answer the question . . . courts must consider whether the federal statute's 'structure and purpose,' or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent.").  U.S. Bank relies on none of these sources to evaluate Congress' intent at the time the statute was passed.  The Court finds that historical evidence and controlling Eighth Circuit precedent support a finding that when the provision was drafted in 1864, the term "at pleasure" would have been interchangeable with "at-will."  *See Westervelt v. Mohrenstecher*, 76 F. 118, 122 (8th Cir. 1896).  Mandating "at-will" employment freed national banks from being contractually restricted of their ability to discharge bank officers

9

(either explicitly or by common law implication).  Consequently, the Court finds that the provision does not conflict with Mr. Bowen's retaliatory discharge claim under the MWA.

Alternatively, even if, as U.S. Bank argues, the Eighth Circuit's ruling in *Westervelt* is interpreted as extending the NBA's "dismiss at-pleasure" provision to preclude more than state-created contractual employment rights, U.S. Bank still does not demonstrate that Congress extended this right without limit, preempting Mr. Bowen's MWA claim. Congress in fact expressly shields bank officers from retaliatory discrimination for reporting possible bank misconduct.  In enacting laws protecting putative whistleblowers, Congress must have intended to restrain the absolute right to fire bank officers under the NBA.

In this inquiry, the Court is therefore guided by several prior cases that have considered how to harmonize federal anti-discrimination and whistleblower laws with the NBA's "dismiss at-pleasure" provision in addressing the issue of preemption.  These cases have found that the NBA is repealed by implication to the extent necessary to give effect to federal laws prohibiting certain retaliatory firings, and have established the following criteria for determining whether the state-law is preempted:  (1) whether the state law "substantively mirrors" federal law; and (2) whether the objectives and underlying policies of the state and federal statutes are parallel.  As explained further below, in applying the analysis here, the Court finds that Mr. Bowen's retaliatory discharge claim under the MWA is not preempted by the NBA.

**B.**       **Analysis**

### 1.  Under a Plain Reading of the NBA's "Dismiss At-Pleasure" Provision, Mr. Bowen's Claim is Not Preempted

Here, U.S. Bank argues that "conflict preemption" operates to bar Mr. Bowen's MWA claim because the MWA's governance of "employment relations" directly conflicts with the "dismiss at-pleasure" provision of the National Bank Act.  (Def.'s Mem. at 7.) Specifically, it claims that, if Mr. Bowen is permitted to pursue his MWA claim, this result "frustrate[s] and create[s] obstacles to the purpose and intent of the NBA" because it exposes banks to "otherwise preempted state law litigation."  (*Id*. at 8.)

But the text and structure of the NBA does not expressly preempt all state employment litigation.  U.S. Bank in fact points to no provision in the NBA that suggests Congress intended to limit a national banks' "exposure" to liability for these types of claims.  Instead, Defendant relies on *Ben Nat'l Bank v. Anderso*n, 539 U.S. 1, 10-11 (2003) to argue that banks are protected from "unfriendly state legislation" because the NBA created "uniform rules limiting the liability of national banks and prescribing exclusive remedies."  (Def.'s Mem. at 6; Def.'s Reply [Doc. No. 17] at 8.)  In *Anderson,* however, the Supreme Court addressed a usury claim, not a state employment claim, and found specific limitations on liability and exclusive remedies set forth by the NBA.  *Id*. at 9-11. Indeed, because the NBA expressly sets forth the "substantive limits on the rates of interest" and the "elements of a usury claim against a national bank," the *Anderson* court understandably found that the NBA provides the exclusive cause of action for usury claims.

*Id*. ("Because §§ 85 and 86 provide the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank.").

Unlike *Anderson*, there is no exclusive cause of action for employment claims in the NBA.  Nor is there any provision that sets forth any elements for this type of claim. U.S. Bank cannot point to any statutory provision in the NBA that suggests that Congress intended to shield banks from the "exposure" of state employment litigation.  While it further relies on *Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 32 (1996), to support preempting all "contrary state law" when Congress grants national banks enumerated powers, (Def.'s Mem. at 6; Def.'s Suppl. Mem. in Supp. of Mot. to Dismiss ("Def.'s Suppl. Mem.") [Doc. No. 30] at 1), the Court finds this precedent does not support such an overreaching result.

In *Barnett*, the Supreme Court considered whether the McCarran-Ferguson Act's authorization of national banks to sell insurance was limited, as the State of Florida argued, to those circumstances permitted by state law.  *Id*. at 32.  The Supreme Court found that the relevant statutory language, which plainly stated that national banks "*may . . .* act as the agent" for insurance sales, 12 U.S.C. § 92, suggests a broad rather than a limited permission, not conditioned upon any grant of state permission.  *Id*. (emphasis added).  By contrast, *Barnett* does not appear to govern here, because the plain language of § 24 (Fifth) of the NBA does not "permissibly" authorize banks to engage in discriminatory conduct by retaliating against employees for reporting possible bank misconduct.

Contrary to U.S. Bank's assertions, conflict preemption does not justify a "freewheeling judicial inquiry into whether a state statute is in tension with federal

objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Whiting*, 563 U.S. at 607 (citations and quotation omitted)).  In *Wyeth v. Levine*, the Supreme Court explained that "[courts] rely on the presumption [against preemption] because respect for the States as independent sovereigns in our federal system leads us to assume that Congress does not cavalierly pre-empt state law causes of action.  The presumption thus accounts for the historic presence of state law but does not rely on the absence of federal regulation."  555 U.S. 555, 565 n.3 (2009) (invoking presumption even when "federal government has regulated drug labeling for more than a century" and concluding that federal law did not preempt certain state law claims concerning drug labeling).

Thus, despite U.S. Bank's insistence on finding a broad federal policy objective— not grounded in the statutory language—the Court is tasked with determining Congress' intent as to the meaning and scope of the NBA's "dismiss at-pleasure" provision from a plain reading of the statute.  *Goldstein v. California*, 412 U.S. 546, 564 (1973) (warning courts not to read laws "as if they were written today, for to do so would inevitably distort their intended meaning.").  Although Congress left "no record of any discussion of the dismiss-at-pleasure provision, or of any specific purpose or motive it might have had in enacting it," when the provision was drafted in 1864, historical evidence surrounding the NBA's enactment demonstrate that the term "at pleasure" would have been interchangeable with "at will."  *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 492 (11th Cir. 2015) (Martin, J., dissenting) (citation omitted) (internal quotation marks omitted)); *see also* Miriam Jacks Achtenberg, Note, Rereading the National Bank Act's 'At Pleasure' Provision: Preserving

the Civil Rights of Thousands of Bank Employees, 43 Harv. C.R.-C.L. L.Rev. 165, 172 (2008); *Kroske v. U.S. Bank Corp.,* 432 F.3d 976, 989 (9th Cir. 2005).  Mandating "at-will" employment clarified that officers were not presumptively annual employees and, in fact, could not be hired for definite terms.  *Id*.

### a. Historical Evidence Surrounding the NBA's Enactment Inform the Meaning of its "Dismiss At-Pleasure" Provision

Indeed, this view of the meaning of the "at pleasure" language makes most sense in the context of the relevant legal background in 1864.  In the eighteenth and early nineteenth century, "[e]mployment for an unspecified term was presumed to be annual, and dismissal within that term had to be for cause."  M.B.W. Sinclair, Employment at Pleasure: An Idea Whose Time Has Passed, 23 U. Tol. L.Rev. 531, 541 (1992).  As noted by Professor Sinclair, although we are now "accustomed to thinking of employment law in the United States as basically a regime of employment at will," this was "not the back-drop against which the 'at-pleasure' language was drafted and enacted."  *Id.* at 540-541.  Rather, the regime of employment was of "annual employment, unless subject to contrary agreement." *Id*.;  *see also* Jay M. Feinman, *The Development of the Employment at Will Rule,* 20 Am. J. Legal Hist. 118, 125 (1976) (highlighting the "rise of employment at will" in the mid-nineteenth century and noting that it was not until "the 1870's [that] the presumption of yearly hiring was recognized as anachronistic").

Two versions of a treatise further illustrate this evolution.  In the nineteenth century, the treatise declares "a general or indefinite hiring is *prima facie* a hiring at will," H. Wood, *A Treatise on the Law of Master and Servant* § 134, at 272 (1877), but in an earlier

version, that same treatise stated that "[w]here no time is limited either expressly or by implication, for the duration of a contract of hiring and service, the hiring is considered ... in point of law a hiring for a year," *see* C. Smith, *Treatise on the Law of Master and Servant* 53 (1852).  As a result, the myriad of laws governing employment in 1864 strongly suggests that Congress intended to free banks from the constraints of the year-term presumption that existed in employment law at the time.  The NBA accomplished this goals in two ways: (1) it "trumped any existing state common law presumption that contracts were for fixed annual terms during which employees could only be dismissed for cause;" and (2) it "forbade national banks from voluntarily entering into a fixed-term employment contract, terminable only for cause."  Miriam Jacks Achtenberg, Note, Rereading the National Bank Act's 'At Pleasure' Provision: Preserving the Civil Rights of Thousands of Bank Employees, 43 Harv. C.R.-C.L. L.Rev. 165, 175 (2008).

### b.    The Eighth Circuit's Ruling in *Westervelt* Supports a Finding that Mr. Bowen's Claim is Not Preempted

This historical evidence is further supported by the Eighth Circuit's interpretation of this provision.  *Westervelt*, 76 F. at 122.  In addressing this provision in 1896, the Eighth Circuit found that the "safety and prosperity of [a] banking institution" depended on allowing active officers to be subject to "immediate removal whenever the suspicion of faithlessness or negligence attaches to them."  *Id.*  (finding that this power afforded banks the means to discharge officers who were felt to compromise an institution's financial "integrity").  Under this view of the bank's power, a number of courts have interpreted this provision to mean only that bank officers are "at will" employees, as opposed to contractual

or "term" employees. *See*, *e.g.*, *Fenno v. Mountain West Bank*, 192 P.3d 224 (Mont. 2008); *Mele v. Fed. Reserve Bank*, 359 F.3d 251, 255 (3d Cir. 2004) (finding that reference should be read as limitation on the general power to enter into contracts);[2] *Katsiavelos v. Fed. Reserve Bank of Chi.*, 1995 WL 103308, at *4 (N.D. Ill. Mar. 3, 1995) (holding that the Illinois Human Rights Act is not preempted "because the 'at pleasure' language ... only serves to pre-empt state law created contractual employment rights"); *Booth v. Old Nat'l Bank*, 900 F. Supp. 836, 843 (N.D.W. Va. 1995); *Mueller v. First Nat'l Bank of Quad Cities,* 797 F. Supp. 656, 663 (C.D. Ill. 1992) ("Th[e] latitude [given to banks in the 'at pleasure' provision] was intended in a contractual sense."); *White v. Fed. Reserve Bank*, 660 N.E.2d 493, 496 (Ohio Ct. App. 1995); *Sargent v. Cent. Nat'l Bank & Trust C*o., 809 P.2d 1298, 1303 (Okla. 1991).

Indeed, even the *Westervelt* ruling concerned only the bank's ability to enter into contracts with officers that guaranteed them a fixed term of employment. 76 F. at 122. The Eighth Circuit rejected the argument that a cashier's appointment each January had "converted his term of office from a continuous term, at the will of the board of directors, into annual terms." *Id*. at 123. The Eighth Circuit then determined that a bank by-law that provides that a cashier "shall hold his office for a stated, one-year term" is void because the "at pleasure" provision prohibits enforcement of definite term contracts. *Id*. Thus, *Westervelt* strongly suggests that the NBA's "dismiss at-pleasure" provision was intended

---

[2]    While *Mele* pertains to the "dismiss at-pleasure" provision in the Federal Reserve Act, courts "ordinarily treat the provision [as] interchangeable" with the "dismiss at-pleasure" clause in § 24 (Fifth) of the NBA. *Goonan v. Federal Reserve of Bank of New York*, 916 F. Supp. 2d 470, 492, n.7 (S.D.N.Y. 2013).

only to prevent banks from contracting away their ability to fire their officers "at will" and to prevent them from entering into annual contracts only terminable for cause.

The Court agrees with the holdings above and finds their reasoning persuasive.  The threat to the "safety and prosperity" of the bank would be eliminated by striking down any contractual obligations under state law; U.S. Bank would not be forced to retain any corrupt or incompetent employees.  *Westervelt*, 76 F. at 122; *see also* Def. Suppl. Mem. at 1.

And, even if, as U.S. Bank argues, Congress granted it great latitude to terminate its officers in order to maintain the "public trust," Defendant does not demonstrate that requiring it to comply with the MWA undermines the "public trust" in these banking institutions.  (Def.'s Mem. at 7; Def.'s Reply at 6.)  The MWA proscribes only discharge (or other forms of retaliation) for reporting, in good-faith, possible bank misconduct.  *See* Minn. Stat § 181.  Allowing U.S. Bank the unfettered right to discharge an officer for reporting illegal bank misconduct, as alleged here, would not serve the "public trust." Rather, this justification for the NBA's "dismiss at-pleasure" provision is served by allowing Defendant "the ability to remove inefficient, incompetent, or dishonest officers 'at will' without contractual challenges stemming from oral representations, employee handbooks, and ambiguous contractual language." *Mueller*, 797 F. Supp. at 663.  Although it argues to the contrary, U.S. Bank fails to demonstrate that whistleblower laws, like the MWA, ties the bank's hands in any way to fire "inefficient, incompetent or dishonest officers." *Id*.

Consequently, the Court finds that, under a plain reading of the "dismiss at-pleasure" provision, the NBA does not preempt Mr. Bowen's retaliatory discharge claim under the MWA.

### 2. Congress' Enactment of Federal Whistleblower Laws Support a Finding that Mr. Bowen's Claim is Not Preempted by the NBA

It is undisputed that Congress itself prohibits certain types of unlawful discharges under federal whistleblower and anti-discrimination statutes.[3]  *See*, *e.g*., 18 U.S.C. § 1514A, 12 U.S.C. § 1831j, 12 U.S.C. § 5567.  As the Ninth Circuit persuasively found in *Kroske v. U.S. Bank Corp.*, Congress must have intended to limit a national bank's authority to dismiss officers "at pleasure" when it later enacted prohibitions against discharges for certain discriminations.  432 F.3d 976, 986-989 (9th Cir. 2005).  Although decided in the context of federal employment discrimination laws, like Title VII and the Age in Discrimination in Employment Act ("ADEA"), the *Kroske* court found these federal anti-discrimination statutes relevant to its preemption inquiry because it determined banks are not exempt from liability under these statutes.  *Id*. at 986.

Likewise, here, the Court finds that federal whistleblower statutes are relevant to the Court's preemption inquiry because U.S. Bank agrees that it can be held liable under these laws.  And, contrary to its assertions, (Def.'s Suppl. Mem. at 1-2), several courts have

---

[3]      While U.S. Bank argues that precedent from federal-law anti-discriminations cases do not apply because more of an amalgalm of federal laws exist protecting whistleblowers, (Def.'s Suppl. Mem. at 3), none of these federal laws explicitly prevent states from asserting their own interests in protecting whistleblowers who warn about illegal bank conduct.  The Court therefore finds the distinction that U.S. Bank attempts to draw unpersuasive.

similarly applied *Kroske's* reasoning to find that federal whistleblower laws, like 12 U.S.C. § 18131j, impliedly repeal the NBA. *Fenno*, 192 P.3d at 230; *Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274 (3d Cir. 2006); *Booth*, 900 F. Supp. at 843 (finding state retaliatory discharge claim was not preempted by the National Bank Act); *Sargent*, 809 P.2d at 1303 (same).

Thus, to analyze how these federal whistleblower statutes should be harmonized with the "dismiss at-pleasure" clause in the NBA, the Ninth Circuit's guidance in *Kroske* still appears instructive as a starting point.[4] In *Kroske*, a national bank officer alleged that she had been terminated because of her age in violation of the Washington Law Against Discrimination ("WLAD"). 432 F.3d at 987. The court found that the "dismiss at-pleasure" provision of the NBA was "repealed by implication only to the extent necessary to give effect" to federal laws prohibiting certain discriminations in employment. *Id.* The *Kroske* court then determined that the WLAD "substantively mirror[ed]" a claim under federal law, and was therefore not preempted. *Id.* at 989.

Because the *Kroske* court did not further define its "substantively mirrors" standard, however, there appears to be a split of authority on how it should be applied. On one hand, the Third Circuit—in the context of a state whistleblower statute similar to the MWA— required that the state statute "exactly match" its federal counterpart, a federal banking whistleblower statute, 12 U.S.C. § 1831j. *Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d

---

[4]    While U.S. Bank further asserts that *Kroske* should not be applied because it "mistakenly applied the presumption against preemption," (Def.'s Suppl. Mem. at 4 n.3) as explained above, the presumption applies "[i]n all preemption cases." *Wyeth*, 555 U.S. at 565.

274, 289-290 (3d Cir. 2006).  In comparing the substantive protections and remedies under both statutes, the *Fasano* court found the state claims preempted because they were not identical.  *Id.* at 289-290.

By contrast, other courts have found that the NBA's "dismiss at-pleasure" provision "does not shield a defendant bank from tort liability for retaliatory discharge when [the] state's public policy is consistent with the federal statute's purpose." *Sargent*, 809 P.2d at 1303 (citation omitted)); *Fenno*, 192 P.3d at 229; *Booth*, 900 F. Supp. at 843.

Here, the Court finds the latter approach more persuasive.  The approach appears to best align with the analysis in *Kroske*, which compared the state law's "substantive provision" with federal law and determined that the WLAD was not preempted because it was "interpreted consistently" with federal law.  *Id.*, 423 F.3d at 987 (noting that the WLAD provides "that it is an unfair practice for any employer to discharge or bar any person from employment because of age" which "mirrors" the substantive provisions of federal law) (citations omitted)).

By applying this approach and, in the absence of clear congressional intent to the contrary, the Court finds that Mr. Bowen's claim under the MWA is not preempted by the NBA for three reasons.  First, although U.S. Bank argues that the MWA does not exactly match any federal whistleblower law, (Def.'s Suppl. Mem. at 6-8), it does not dispute that the MWA is intended to prohibit the same type of wrongful discharge prohibited under federal statute.  Second, courts interpret the MWA by relying on federal law as guidance.  Third and finally, this result comports with Eighth Circuit precedent and recent Supreme Court precedent, which narrows the doctrine of conflict preemption.

> **a.     The MWA "Substantively" Mirrors Federal Whistleblower Laws by Achieving Identical Policy Goals**

First, while it appears true that the language of the MWA does not precisely match any particular federal whistleblower law, the MWA substantively mirrors federal whistleblower laws because it unquestionably achieves identical policy goals by protecting bank employees from retaliation for reporting illegal activity.  The Montana Supreme Court in *Fenno* reached the same conclusion.  There, the court examined a similar state statute which allowed for even broader protections for putative whistleblowers than the MWA.  192 P.3d at 230.  In *Fenno*, a former internal audit officer asserted that the bank violated the Montana Wrongful Discharge Employment Act ("WDEA") by allegedly terminating him in retaliation for reporting a banking irregularity that was a potential violation of public policy.  *Id.*  In addressing the issue of federal preemption, the Montana Supreme Court examined provisions of the WDEA and federal statute.  As U.S. Bank also notes here, the federal whistleblower statute *Fenno* analyzed, 12 U.S.C. § 1831j(a)(1), protects employees from retaliatory discharge for certain actions when those employees report violations to a "federal agency or the U.S. Attorney General."  *Id.* at 228.  The WDEA, by contrast, prohibits wrongful discharge generally "if it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy" but does not specify to whom the employee must report the violation.  *Id.*

Nonetheless, the Montana Supreme Court found that these relatively minor statutory differences failed to justify preemption of a claim under the WDEA.  *Id.* at 230.  Specifically, the *Fenno* court explained that Congress' "objective" in drafting the NBA's

"dismiss at-pleasure" provision—to "maintain[] the institution's financial integrity"—is "not without a limit . . . when the public policy [that] gives rise to the retaliatory discharge claim parallels that of the federal law which is sought to be invoked as a shield from liability." *Id.* at 229-231 (citing *Westervelt*, 76 F. 118 at 122) (further citations and quotation omitted)). Because both the "federal statutes and the WDEA protect employees who take steps in their employment to promote the enforcement of laws and regulations[,]" the *Fenno* court determined that plaintiff's retaliatory discharge claim under the WDEA is not preempted. *Id.* at 230 (further finding that the NBA's "dismiss at-pleasure" provision has been "repealed impliedly to the extent necessary to effectuate 12 U.S.C. 1831§ 1831j(a)(1).").

Like *Fenno*, here, U.S. Bank has not demonstrated that any of the MWA's statutory differences stand as an "obstacle" to Congress' "objective" in enacting the NBA, particularly in light of their later enactment of federal whistleblower laws. As *Fenno* persuasively explains, Congress' objectives in passing these federal statutes are to shield national bank employees "from discrimination in retaliation for reporting possible bank misconduct" and protect those who take steps to "promote the enforcement of laws." *Id.* at 230. Like these federal statutes, the MWA was also adopted to prohibit retaliatory discharges of putative whistleblowers and protect those engaged in reporting, in good faith, a violation or suspected violation of law. Minn. Stat § 181. Thus, the statutory differences do not support an inference that the MWA offends the "purposes and objectives of Congress." *Fenno,* 192 P.3d at 230. Because the MWA does not appear to conflict in any

way with the objectives and policies underlying these federal statutes, the Court finds no federal preemption of Mr. Bowen's MWA claim.

### b.      Courts Rely on Federal Law as Guidance to Construe the MWA

That the MWA "substantively mirrors" federal law is further reinforced by certain courts that rely on "analogous federal retaliation law" to construe the MWA. *Ha Xuan Thu v. Park N' Fly, Inc*., No. 09-cv-2522 (JRT/SER), 2011 WL 334973, at *5 n.6 (D. Minn. 2011) (noting that "[i]n construing the MWA, courts may consider as guidance federal courts' interpretation of analogous federal retaliation law") (citation omitted)); *see also Kidwell v. Sybaritic, Inc*., 784 N.W.2d 220, 227 (Minn. 2010) (relying on federal cases construing the Whistleblower Protection Act when interpreting retaliation claim under MWA).  While Defendant relies on one district court ruling that analyzed the claims under Title VIII of the Sarbanes-Oxley Act ("SOX") and the MWA separately, the court there acknowledged that the "basis of [p]laintiff's MWA claim" was "set forth" the same as her SOX claim and the arguments for dismissal of the MWA claim "track [the] attack on the SOX claim."  (Def.'s Suppl. Mem. at 3) (citing *Miller v. Stifel, Nicolaus & Co*., 812 F. Supp. 2d 975, 990-991 (D. Minn. 2011)).  The *Miller* court then dismissed both claims because plaintiff did not engage in "protected activity" under either statute.  812 F. Supp. at 987-991.

The Court therefore finds that *Miller* does not necessarily foreclose a finding that the MWA substantively mirrors the SOX.  And, contrary to U.S. Bank's assertions, the other cases above appear to suggest that the MWA in fact mirrors the substantive provisions of federal whistleblower laws.

23

### c. Eighth Circuit Precedent and Supreme Court Precedent Support a Finding that the MWA Claim is Not Preempted by the NBA

Finally, this result comports with Eighth Circuit precedent and recent Supreme Court precedent, which narrows the doctrine of conflict preemption. Although U.S. Bank addresses the Eighth Circuit's ruling in *Westervelt* at length, it does not address the Eighth Circuit's ruling in *Rankin v Tygard*, 198 F. 795 (8th Cir. 1912), which also confronted the "dismiss at-pleasure" provision of the NBA. The *Rankin* court again interpreted the provision solely as a restriction on a bank's ability to enter voluntarily into a fixed-term contract, rather than a grant to the bank to ignore otherwise applicable state law. *Id.* at 799. The Eighth Circuit again clarified that the purpose of the "dismiss at-pleasure" provision was to prevent the bank from entering into definite term contracts terminable only for cause. *Id.* However, it can "contract that, subject to free exercise of this power of removal *at will*, it will not continue [a bank officer] in office beyond a specified time without another appointment, [or] that subject to the right to exercise its power of *removal at pleasure* it will continue him until that time." *Id.* (emphasis added). The Eighth Circuit therefore has consistently interpreted the "dismiss at-pleasure" provision as a limit only on the bank's ability to contract away its right to remove its officers.

In opposition, U.S. Bank continues to rely heavily on the Eleventh Circuit's ruling in *Wiersum* to support its demand for preemption.[5] (Def.'s Suppl. Mem. at 2.) As

---

[5] US Bank also urges the Court to consider Mr. Bowen's voluntary withdrawal of his federal whistleblower claim, arguing that it is obvious that he has no claim here. (Def.'s Suppl. Mem. at 8; *see also* [Doc. No. 24].) But, the Court finds that this argument concerns the merits of the claim, rather than the legal issue of preemption, and will therefore address such an argument at the appropriate time.

explained in its Supplemental Briefing Order, the Court finds Defendant's reliance misplaced for two reasons.  First, the *Wiersum* court declined to address whether the NBA was only meant to ensure that bank officers were treated as "at will" employees.  As explained above, the Eighth Circuit and several courts have interpreted the "dismiss at-pleasure" provision in the NBA as preempting state-law claims that seek to enforce term-employment contracts for bank officers.  Second, the *Wiersum* court fails to address the relevance of federal whistleblower statutes to this inquiry.  National banks are not exempt from liability under these laws; indeed, U.S. Bank makes no argument, nor could it, that the bank could act in violation of federal statutes without violating the law.

Thus, without any other indication from the statute's text that Congress intended to foreclose national banks from all state law employment claims, the Supreme Court has instructed that courts must not "invalidate state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law."  *Wyeth*, 555 U.S. at 583 (Thomas, J., concurring)).  Accordingly, U.S. Bank has failed to demonstrate that Mr. Bowen's MWA claim should be dismissed based on the doctrine of conflict preemption.

**IV.    ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Defendant's Motion to Dismiss [Doc. No. 5] is **DENIED**.


Dated:    June 22, 2020                                      s/Susan Richard Nelson
                                                            SUSAN RICHARD NELSON
                                                            United States District Judge